THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone:  (858) 794-1441
Facsimile:  (858) 794-1450
kah@weiserlawfirm.com

*Counsel for Plaintiff*

[Additional counsel listed on the signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK TAYLOR, derivatively on behalf of CYTRX CORPORATION, | Case No. |
| Plaintiff, | |
| vs. | |
| STEVEN A. KRIEGSMAN, JOHN Y. CALOZ, MAX E. LINK, MARVIN R. SELTER, LOUIS J. IGNARRO, JOSEPH RUBINFELD, and RICHARD L. WENNEKAMP, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| - and - | |
| CYTRX CORPORATION, a Delaware corporation, | |
| Nominal Defendant. | **DEMAND FOR JURY TRIAL** |

1.     Plaintiff Jack Taylor ("Plaintiff") by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant CytRx Corporation ("CytRx" or "Cytrx" or the "Company") against certain members of CytRx's Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.     According to its public filings, CytRx operates as a biopharmaceutical research and development company specializing in oncology.

3.     In 2013, the defendants secretly hired stock promotion firm the DreamTeam Group ("DreamTeam") and/or its subsidiary to begin a misleading campaign designed to boost the Company's stock price.[1]  The plan (which was not disclosed to CytRx's stockholders) was simple, and would be executed in two main parts.  First, DreamTeam would post and publish misleading articles and comments on investor websites (such as *SeekingAlpha.com*), touting the supposed strength of CytRx and its products.  At no time did these "articles" disclose that CytRx (under the defendants' direction and on their watch) had paid for the promotion.  The defendants coordinated their own United States Securities and Exchange Commission ("SEC") disclosures with these DreamTeam "articles" touting the Company's future prospects.  Second, when the share price was high enough, the defendants would cause the Company to conduct a secondary offering of Company stock at an artificially inflated price.

4.     Notably, DreamTeam did not promote the Company's products to potential customers, or even possible partners.  Rather, its sole focus was promoting the Company stock on various investment mediums (such as *SeekingAlpha.com*).  Additionally, DreamTeam purportedly gave the defendants final say regarding the content of the articles (such as "news"

---

[1] Upon information and belief, MissionIR was the affiliate of DreamTeam that the defendants may have entered into the agreement with.  For purposes of this complaint, DreamTeam will be referring to any entity and/or affiliate of that firm.

- 1 -

regarding clinical trials), and prohibited the writers from disclosing the fact that they were being paid to write the articles.   Correspondence indicates that the assistant of defendant Steven Kriegsman (President and Chief Executive Officer of the Company, further defined herein) personally made edits to the promotional articles later published by fictitious authors.

5.     Due to the defendants' illicit actions, CytRx's stock price rose significantly.   For reference, in November 2013, CytRx's stock price traded at just above $2.00 per share.   By January 2014, due to the defendants' illicit actions, CytRx's stock price was trading at an artificially inflated price as high as $8.00 per share.   With phase one of the scheme complete, the defendants proceeded to phase two: a secondary offering of Company stock in February 2014, at an artificially inflated price of $6.50 per share.

6.     Further, in December 2013, the defendants utilized their material, non-public information to market time stock options they awarded to themselves.   As set forth herein, the Board's Compensation Committee approved a grant of stock options to five of the six members of the Board which vested **one day prior** to a Company press release that caused Cytrx's stock price to skyrocket more than 127%.   These five Board members (all defendants named herein) received approximately **$3 million** in unjust compensation from this particular breach of fiduciary duties.

7.     On March 13, 2014, the defendants' scheme unraveled. On that day, an article was published on *SeekingAlpha.com* entitled "Behind The Scenes With Dream Team, CytRx And Galena."   The article revealed the illicit scheme that the defendants had engaged in with DreamTeam, including that fact that shares of CytRx had quadrupled during the undisclosed "promotion," and that there was evidence to suggest that the defendants had edited, changed and approved the paid "articles."

8.     After it was revealed that several of these "articles" were written by the same person (using multiple aliases), the articles were removed from the site without the disclosure of the paid marketing relationship with CytRx.

9.    Following this revelation, CytRx stock fell to a close of $4.17 per share on March 13, 2014.

10.   As a result of defendants' wrongdoing, CytRx has been damaged.

## JURISDICTION AND VENUE

11.   Jurisdiction is conferred by 28 U.S.C § 1332.  Complete diversity exists among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.   This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

13.   Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

**I.   Plaintiff**

14.   Plaintiff is a current shareholder of CytRx and has continuously held CytRx stock since November 2010.  Plaintiff is a citizen Georgia.

**II.   Nominal Defendant**

15.   Nominal Defendant CytRx is a Delaware corporation, with its principal executive offices located at 11726 San Vicente Boulevard, Suite 650, Los Angeles, California 90049.

- 3 -

III.     The Individual Defendants

16.     Defendant Steven A. Kriegsman ("Kriegsman") currently serves as the Company's President and Chief Executive Officer ("CEO"), and has served as a director of CytRx since 2002.  According to CytRx's website:

> Mr. Kriegsman has been CytRx Corporation's President and Chief Executive Officer and a director since July 2002. He also serves as a director of RXi Pharmaceuticals Corporation (Nasdaq: RXII) and Chairman of RXi's Compensation and Transaction Committees. He previously served as Director and Chairman of Global Genomics from June 2000. Mr. Kriegsman is an inactive Chairman and Founder of Kriegsman Capital Group LLC, a financial advisory firm specializing in the development of alternative sources of equity capital for emerging growth companies in the healthcare industry. He has advised such companies as SuperGen Inc., Closure Medical Corporation, Novoste Corporation, Advanced Tissue Sciences, and Maxim Pharmaceuticals. Mr. Kriegsman has a BS degree with honors from New York University in Accounting and completed the Executive Program in Mergers and Acquisitions at New York University, The Management Institute. Mr. Kriegsman is a graduate of the Stanford Law School Directors' College. Mr Kriegsman was formerly a Certified Public Accountant with KPMG in New York City. He served as a Director and is the former Chairman of the Audit Committee of Bradley Pharmaceuticals, Inc. (NYSE, the company has since been sold). In February 2006, Mr. Kriegsman received the Corporate Philanthropist of the Year Award from the Greater Los Angeles Chapter of the ALS Association and in October 2006, he received the Lou Gehrig Memorial Corporate Award from the Muscular Dystrophy Association. Mr. Kriegsman has been a guest speaker and lecturer at various universities including California Institute of Technology (Caltech), Brown University and New York University. Mr. Kriegsman has been active in various charitable organizations including the Biotechnology Industry Organization, the ALS Association, the Los Angeles Venture Association, the Southern California Biomedical Council, the California Health Initiative, the American Association of Dance Companies, and the Palisades-Malibu YMCA

On information and belief, Kriegsman is a citizen of California.

17.     Defendant John Y. Caloz ("Caloz") has served as the Company's Chief Financial Officer since 2009.  According to CytRx's website:

> Mr. Caloz has an accomplished history of providing senior financial leadership in the life sciences sector, serving most recently as CFO for IRIS International Inc. (NASDAQ:IRIS), a medical device manufacturer from 2001 to 2004. Before joining IRIS, he was CFO at Synarc, Inc., a startup medical imaging services company with operations in the U.S. and Europe. From 1993 to 1999, he was SVP, Finance and CFO of Phoenix International Life Sciences Inc., a TSX and NASDAQ listed CRO that was acquired by MDS Inc. (TSX:MDS; NYSE:MDZ) in 1999. Mr. Caloz, a Chartered Accountant, holds a B.A. in Accounting from York University, Toronto, ON.

On information and belief, Caloz is a citizen of California.

18.     Defendant Max E. Link ("Link") has served on the CytRx Board since 1996. Link is CytRx's Chairman of the Board and serves on the Audit and Compensation Committees. According to CytRx's website:

> Dr. Link has been a director since 1996. Dr. Link has been retired from business since 2003. From March 2002 until its acquisition by Zimmer Holdings, Dr. Link served as Chairman and CEO of Centerpulse, Ltd. From May 1993 to June 1994, Dr. Link served as the Chief Executive Officer of Corange Ltd. (the holding company for Boehringer Mannheim Therapeutics, Boehringer Mannheim Diagnostics and DePuy International). From 1992 to 1993, Dr. Link was Chairman of Sandoz Pharma, Ltd. From 1987 to 1992, Dr. Link was the Chief Executive Officer of Sandoz Pharma and a member of the Executive Board of Sandoz, Ltd., Basel. Prior to 1987, Dr. Link served in various capacities with the U.S. operations of Sandoz, including President and Chief Executive Officer. Dr. Link also serves as a director of Alexion Pharmaceuticals, Inc., Celsion Corporation and Discovery Laboratories, Inc., each of which is a public company.

Upon information and believe, Link is a citizen of New York.

19.     Defendant Marvin R. Selter ("Selter") has served on the CytRx Board since October 2003.   Selter serves as Chair of the Audit Committee and as a member of the Compensation and Nominating and Corporate Governance Committees.   According to CytRx's website:

> He has been President and Chief Executive Officer of CMS, Inc. since he founded that firm in 1968. CMS, Inc. is a national management consulting firm. In 1972, Mr. Selter originated the concept of employee leasing. He served as a member of the Business Tax Advisory Committee—City of Los Angeles, Small Business Board—State of California and the Small Business Advisory Commission—State of California. Mr. Selter also serves on the Valley Economic Development Center as past Chairman and Audit Committee Chairman, the Board of Valley Industry and Commerce Association as past Chairman, the Advisory Board of the San Fernando Economic Alliance and the California State University—Northridge as Past Chairman of the Economic Research Center and President of the Olive View UCLA Medical Center Foundation. He has served, and continues to serve, as a member of boards of directors of various hospitals, universities, private medical companies and other organizations. Mr. Selter attended Rutgers—The State University, majoring in Accounting and Business Administration. He was an LPA having served as Controller, Financial Vice President and Treasurer at distribution, manufacturing and service firms. He has lectured extensively on finance, corporate structure and budgeting for the American Management Association and other professional teaching associations.

On information and belief, Selter is a citizen of California.

20.     Defendant Louis J. Ignarro ("Ignarro") is a current director and has served on the Board since 2002.  According to CytRx's website:

> Dr. Ignarro received the Nobel Prize for Medicine in 1998, and has been a director since July 2002. He previously served as a director of Global Genomics

> since November 20, 2000. Dr. Ignarro serves as the Jerome J. Belzer, M.D. Distinguished Professor of Pharmacology in the Department of Molecular and Medical Pharmacology at the UCLA School of Medicine. Dr. Ignarro has been at the UCLA School of Medicine since 1985 as a professor, acting chairman and assistant dean. Dr. Ignarro received a B.S. in pharmacy from Columbia University and his Ph.D. in Pharmacology from the University of Minnesota.

On information and belief, Ignarro is a citizen of California.

21.     Defendant Joseph Rubinfeld ("Rubinfeld") is a current director and has served on the Board since 2002.  Rubinfeld serves as the Chairman of the Compensation Committee and serves as the Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee.  According to CytRx's website:

> Dr. Rubinfeld has been a director since July 2002. He co-founded SuperGen, Inc. in 1991 and has served as its Chief Executive Officer and President and as a director since its inception until December 31, 2003. He resigned as Chairman Emeritus of SuperGen, Inc. on February 8, 2005. Dr. Rubinfeld was also Chief Scientific Officer of SuperGen from 1991 until September 1997. Dr. Rubinfeld was one of the four initial founders of Amgen, Inc. in 1980 and served as a Vice President and its Chief of Operations until 1983. From 1987 until 1990, Dr. Rubinfeld was a Senior Director at Cetus Corporation and from 1968 to 1980, Dr. Rubinfeld was employed at Bristol-Myers Company, International Division in a variety of positions. Dr. Rubinfeld received a B.S. degree in chemistry from C.C.N.Y. and an M.A. and Ph.D. in chemistry from Columbia University.

On information and belief, Rubinfeld is a citizen of California.

22.     Defendant Richard L. Wennekamp ("Wennekamp") is a current director and has served on the Board since 2003.  Wennekamp is the Chairman of the Nominating and Corporate Governance Committee and serves on the Audit and Compensation Committees.  According to CytRx's website:

> Mr. Wennekamp has been a director since October 2003. He retired from Community Bank in June 2008 where he was the Senior Vice President-Credit Administration since October 2002. From September 1998 to July 2002, Mr. Wennekamp was an executive officer of Bank of America Corporation, holding various positions, including Managing Director-Credit Product Executive for the last four years of his 22-year term with the bank. From 1977 through 1980, Mr. Wennekamp was a Special Assistant to former President of the U.S., Gerald R. Ford, and the Executive Director of the Ford Transition Office. Prior thereto, he served as Staff Assistant to the President of the U.S. for one year, and as the Special Assistant to the Assistant Secretary of Commerce of the U.S.

On information and belief, Wennekamp is a citizen of California.

23.     Defendants Kriegsman, Link, Rubinfeld, Selter, Wennekamp and Ignarro are collectively referred to as the "Director Defendants."

24.     Defendants Kriegsman, Caloz, Link, Rubinfeld, Selter, Wennekamp and Ignarro are collectively referred to as the "Individual Defendants."

25.     Defendants Link, Selter and Wennekamp are collectively referred to as the "Audit Committee Defendants."

**THE INDIVIDUAL DEFENDANTS' DUTIES**

26.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

(b)     exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)     refrain from wasting CytRx's assets;

(d)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(e)     properly disclose all material information regarding the Company, required by applicable state and federal laws and/or their relevant duties, to CytRx's shareholders.

28.     The Audit Committee Defendants were charged with, among other things, discussing with management the Company's major financial risk exposures (including potential or pending litigation and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies, and then discuss those steps with the independent auditor.  Further, the Audit Committee Defendants were charged with discussing with or obtaining reports from management and corporate counsel confirming that the Company is in conformity with applicable legal requirements relating to financial and accounting matters and the Company's Code of Business Conduct and Ethics (the "Code of Ethics"), and reviewing annual compliance with the Code.  This included reviewing reports and disclosures on insider and affiliated party transactions, and advising the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations relating to financial and accounting matters and with the Company's Code of Ethics, as and when adopted by the Board.  Moreover, the Audit Committee Defendants were charged with serving as an independent and objective party to monitor the Company's financial reporting process and internal control system.

29.     The Individual Defendants, and all employees of the Company, were required to comply with the Company's Code of Ethics, which was in effect at the time of the Individual Defendants' misconduct.  The Code of Ethics states, in relevant part:

*CytRx Corporation and its subsidiaries (the "Company") will conduct its business honestly and ethically wherever we operate.* We will constantly attempt to improve the quality of our services, products and operations and will maintain a reputation for honesty, fairness, respect, responsibility, integrity, trust and sound business judgment. No illegal or unethical conduct on the part of our directors, officers or employees or their affiliates is in the Company's best interest. ***The Company will not compromise its principles for short-term advantage. The***

*honest and ethical performance of the Company is the sum of the ethics of the men and women who work here.* Therefore, we are all expected to adhere to high standards of personal integrity.

\*     \*     \*

1.  **Compliance with Applicable Laws, Rules and Regulations.**

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers and employees must respect and obey the laws of the United States and of the cities, states and countries in which we operate. In particular, all directors, officers and employees must comply with federal securities laws, rules and regulations that govern the Company.

\*     \*     \*

Accordingly, our Chief Executive Officer and Chief Financial Officer and all senior financial officers are responsible for full, fair, accurate, timely and understandable disclosure in our periodic reports required to be filed by with the SEC, and it is the responsibility of our Chief Executive Officer and each senior financial officer to report to our Audit Committee any untrue statement of material fact and any omission of material fact of which he or she may become aware that affects the disclosures made by us in our public filings. Also, the Chief Executive Officer and Chief Financial Officer and each senior financial officer must promptly report to our Audit Committee any information he or she may have concerning significant deficiencies in the design or operation of disclosure and internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

\*     \*     \*

**14. Enforcement of the Code of Business Conduct and Ethics.**

A violation of this Code by any director, officer or employee will be subject to disciplinary action, including possible termination of employment. The degree of discipline imposed by the Company may be influenced by whether the person who violated this Code voluntarily disclosed the violation to the Company and cooperated with the Company in any subsequent investigation. In some cases, a violation of this Code may constitute a criminal offense that is subject to prosecution by federal or state authorities.

## SUBSTATIVE ALLEGATIONS

**The Stock Promotional Scheme**

30.     During the Relevant Period, the Individual Defendants caused and/or allowed to be published a series of promotional articles written by paid stock promotion firm DreamTeam. These articles, which directly manipulated CytRx's stock price, were written by "authors" who were directed not to disclose the fact that they were being compensated for their services.  Also during this time, the Individual Defendants manipulated the timing of noteworthy disclosures

1  relating to the Company's core business to immediately follow their annual "incentive" stock

2  grants to in order to enrich themselves.

3       31.    The stock promotion scheme was publicized by an unlikely individual, the very

4  person whom DreamTeam purportedly attempted to hire to write the articles.  Richard Pearson

5  ("Pearson"), a frequent author/contributor on the widely read website, *Seeking Alpha,* broke the

6  news in an article entitled "Behind the Scenes With DreamTeam, CytRx and Galena" on March

7  13, 2014, describing how he was ***directly solicited*** by DreamTeam to "write paid promotional

8  articles on Galena Biopharma, Inc. ["Galena" or "GALE"] and CytRx Corp (CYTR), without

9  disclosing payment."[2]

10       32.    The stated goal of Pearson's investigation was to "determine how involved

11  management from these two companies were in this undisclosed paid promotion scheme."[3]

12  Pearson's article concluded that, based upon the emails and attachments he received,

13  "management from both Galena and CytRx were intimately involved in ***reviewing and editing***

14  ***the paid articles on their own stock*** at precisely the time they were looking to sell / issue

15  shares."  (emphasis in original).  The article, titled "Behind the Scenes With DreamTeam, CytRx

16  and Galena" is reproduced in total below and provides a first-hand account of exactly how the

17  DreamTeam solicited Pearson to write favorable articles on behalf of CytRx, how these articles

18  coincided with disclosures from the Company and the stock offering, and how CytRx's stock

19  share price responded to these various events.  The article set forth the following:

20  **Summary**

21  - Shares of CYTR and GALE both quadrupled during an undisclosed paid
     promotion via DreamTeam.
22  - Documents show that CYTR and GALE management edited, changed and
     approved the paid articles.
23  - At the peak of the promotion, CYTR issued $86 million in new equity

---

25  [2]    Available: [http://seekingalpha.com/article/2086173-behind-the-scenes-with-dream-team-cytrx-and-galena]; Accessed March 26, 2014.

26  [3]    Importantly, CytRx's CEO and President is defendant Kriegsman, who is a member of

27  the Galena Board of Directors which was also recently implicated in a similar alleged scandal
    regarding DreamTeam and stock pumping.

while GALE insiders sold personal stock.
- Over 100 DreamTeam articles have been removed from various sites in the past two days.
- At least 13 articles on CYTR alone have been removed from publication.

*(Editor's Note: Upon reviewing Mr. Pearson's article, we removed articles from Seeking Alpha that were in violation of our policies. We take author integrity very seriously and appreciate Richard's work in helping us identify authors who were in breach of our contributor Terms of Use.)*

*Author's Note: At least 13 recent articles covering CytRx have been removed from circulation at Seeking Alpha, Wall Street Cheat Sheet, Motley Fool and Forbes. Many were removed in just the past two days. A list of these removed articles is shown at the bottom of this article. The author has preserved PDF copies of these articles at MoxReports.com.*
*In total, more than 100 articles tied to The DreamTeam have now been removed from circulation in just the past two days.*

**Overview**

A few weeks ago I received a surprising email asking me to be a paid stock tout for IR firm "The DreamTeam Group." I was asked to write paid promotional articles on Galena Biopharma (GALE) and CytRx Corp (CYTR), without disclosing payment. Rather than refuse outright, I decided to investigate. I began submitting dummy articles to the DreamTeam rep (with no intention of ever publishing them). My goal was to determine how involved management from these two companies were in this undisclosed paid promotion scheme. Below I will provide detailed documentation (emails and attachments) that indicate management from both Galena and CytRx were intimately involved in **reviewing and editing the paid articles on their own stock** at precisely the time they were looking to sell / issue shares.

Management will have a very difficult time convincing investors that "we didn't know." The articles were provided from DreamTeam directly to CytRx and Galena. Management then edited and approved the articles and would have seen the lack of disclosure. When they appeared in final publication there was again no disclosure. And it seems no coincidence that there appears to have been great urgency to get these articles in almost exact proximity to sales / issuances of stock by insiders and the companies at both Galena and CytRx.

Many investors are aware that Galena was previously a subsidiary of CytRx and that the CEO of CytRx also sits on the board of Galena.

The promotional articles and the paid retention of the DreamTeam Group were **coordinated with the release of news** and data from the companies such that they coincided with the share prices of both stocks rising dramatically. News events included items like the completion of Phase 2 trials, the inception of new trials and the receipt of an SPA from the FDA. Clearly these would all normally be expected to have a positive effect on their own. Yet management used coordinated articles in the media to interpret and amplify the effect of the news which it had released.

The promotional campaigns by DreamTeam extended to various web sites including Forbes, TheStreet.com, Motley Fool, Wall Street Cheat Sheet and Seeking Alpha. Multiple aliases were used, some of which pretended to be hedge

- 11 -

fund managers. At least 13 articles on CytRx alone have now been removed, most of those during the past two days alone.

The undisclosed media promotions coordinated with the release of news and data saw both of these stocks rise from around $2.00 in November to around $8.00 by January. The fact that these recent news releases were concurrent with undisclosed stock promotions casts significant doubt on many of the fundamental statements made by these companies regarding their drug prospects.

Below I include a review of Federal Securities Laws Section 17b (regarding touting) and Section 10b(5) (the anti-fraud provision). Given that the recent equity offering from CytRx occurred on the back of this undisclosed promotion, it creates the potential that the proceeds from the offering may be at significant legal risk. Investors who bought into the offering at $6.50 are already well underwater. They may find these promotions to have been very disturbing in the context of their flagging investment.

**Broader awareness of these issues could see the share prices of both CytRx and Galena trade to well below $2.00, back where they were when the promotions began.**

*Preliminary notes*

*Note #1: Shortly prior to publishing this article, the author notified the United States Securities and Exchange Commission about the details described herein. Portions of this content were also shared with media outlets including Seeking Alpha, Wall Street Cheat Sheet and TheStreet.com which had previously published articles by DreamTeam writers.*

*Note #2: Prior to publication, the author contacted CytRx Corp, Galena Biopharma, and Michael McCarthy of DreamTeam Group. Their responses are noted in Appendix II.*

*Note #3: During the course of this investigation I have exchanged dozens of emails with individuals who admit to promoting CytRx, Galena and other companies in exchange for undisclosed payments. I have included copies of some of these emails as links below. These should be read from bottom to top so as to be read in chronological order. In some cases, certain personal information including email addresses and phone numbers have been redacted and are displayed as XXXXX in red font. The author also has numerous additional emails which he is still processing and which have not been included in this article.*

*Note #4: Before I undertook any of this, I first sent an email to a neutral 3rd party and to my attorney letting them know about this experiment and putting into advance writing the fact that at no time would I ever publish any of these articles nor would I accept any compensation. This was for my own protection. I strongly discourage readers from engaging in this type of research on their own.*

*Note #5: DreamTeam also operates via a sub-brand called Mission IR. I have used Mission and DTG interchangeably throughout this article. Mission IR is a frequent poster of messages at Investors Hub. Their page on Investors Hub provides a list of companies for which they have recently been engaged. (It also includes several obvious decoys such as Facebook and Twitter).*

**Background**

A few weeks ago I received an email and subsequent phone calls asking me to be a paid stock tout for an IR firm called The DreamTeam Group ("DTG"). The sender first informed me about an article he wanted on CytRx Corp., and later asked for additional articles on Galena Biopharma, among others.

This was a notably odd invitation for me to receive given that I generally write very negative articles focused on inappropriate (and sometimes what I view as illegal) behavior by US-listed companies and their promoters. It was clear that the individual contacting me had not even bothered to read what I have written in the past. He clearly had no idea what he had just stumbled into by contacting me of all people.

The individual ultimately revealed his name to be Tom Meyer. He later informed me that the IR firm he works for was the DreamTeam and that he worked closely with the head of DreamTeam, Michael McCarthy. In his initial emails and in subsequent phone discussions, I was offered $300 per article, but was also told that there were two conditions. First, management of the companies would have to **sign off (and edit)** the articles. Second, I would **not be allowed to disclose** that I was getting paid.

> 'Hi Rick,
>
> Thanks for getting back to me so soon. I work for an IR firm and I have a team that I manage. So when the firm has a new client, they will ask me to start getting some articles published on various sites. And then my team will get started on it.
>
> We typically cover biotech companies but occasionally will have some others as well.
>
> When I give you an assignment, you will type up the draft and then send back to me so I can get the company's approval. I will send you back the edited version and then you can publish. Once published, I will pay you $300. We send checks to our guys every 2 weeks.
>
> Let me know if that is of interest to you.
>
> Thanks a lot,
>
> Tom'

I was told to not worry about posting on Yahoo message boards, because DTG has a full team which handles the posting of numerous bullish messages on places like Yahoo Finance.

I felt that there was a lot of information to be uncovered if I dug deeper. So rather than immediately make my findings public, I chose to fly to Chicago to meet Mr. Meyer in person and then submit a series of "dummy articles" to him to see what response I could get. (At minus 20 degrees, Chicago was actually 100 degrees colder than Los Angeles during my visit!)

My goal in submitting dummy articles to DTG was to determine the level of involvement of management of these companies in reviewing and editing articles.

- 13 -

To me, this was of far greater significance than the (already troubling) non-disclosure by various authors and IR firms who might be getting paid. As a result, I submitted dummy articles to Tom / DreamTeam on both CytRx and Galena as well as a few others.

***With CytRx I was able to receive fully edited copies of the dummy articles which bore the electronic signature of the VP of Business Development (David Haen) as well as by the Assistant to the CEO (Lauren Terrado). The conclusion I reached is obvious: management at CytRx was intimately involved in editing these documents extensively.***

With Galena, I was told that the company suddenly changed its mind and cancelled the article on February 10th, almost immediately prior to an exposé article by Adam Feuerstein at TheStreet. Based on this, I am under the assumption that Galena backed out from wanting an article from me as a result of Mr. Feuerstein calling them just before publishing his article. In any event, the offer of payment still stood from Tom/DTG as compensation for my time.

**The writers and their aliases**

Throughout the course of our discussions, Mr. Meyer discussed with me an additional writer who writes for him on CytRx and Galena. His name is John Mylant. Mr. Mylant writes for both Seeking Alpha and for TheStreet.com and has published 3 articles on CytRx and 1 on Galena. (Note: these articles on CytRx and Galena have since been removed from Seeking Alpha.)

Via email and phone I was able to confirm with Mr. Mylant that he was paid by DTG to publish articles on CytRx and GALE and that management had signed off on them because that is what they are paying for. In addition, confirming the involvement of Mr. Mylant should not prove to be too difficult given that DTG does require its writers to fill out a form W9 for tax purposes. Mr. Mylant's only complaint seems to be that DTG only pays him $300 which is well below his standard rate for the **other** IR firms he works for which pay $525 per article. From Mr. Mylant on February 21st:

> 'DreamTeam people do only pay $300. I actually stopped working with them. The work I did for [XXXXX] was through another company wasn't with them. I am not sure who you talk to their work with DreamTeam, but some of the articles that I saw were very second rate articles and really can work trying to get people to buy into the company. Very poorly written. DreamTeam were the only ones that paid that low to me. When I told people I charge $525, they didn't blink. I only wrote for Tom you times because he just didn't pay enough and I thought the company was very shady.'

*Note: information regarding other companies which could not be verified has been redacted until 3rd party verification can be obtained.*

**The links to the emails above make it clear that Mr. Mylant had been working for DreamTeam and had published on both Galena and CytRx for DreamTeam.**

Together, Mr. Meyer and Mr. Mylant have published 13 articles on CytRx since November, some of which had a very dramatic impact on the share price. In addition to doing much writing, Mr. Meyer also appears to have served as the go-

between for Michael McCarthy (head of DTG) when coordinating the writing of other authors such as Mr. Mylant when he wrote on Galena.

On February 6th, I asked Mr. Meyer the following:

> 'on GALE, I thought that John Mylant did a great piece this week, but he did not address the short attack. did the company approve his piece ?

To which Mr. Meyer responded:

> 'John wrote his article before the short piece came out. It was published after but written before. **The company just took a long time to approve it. Wouldn't have been fair to make him go back and add something else.**
>
> **He's been working for me 4 months or so.** He's pretty good, gets things written pretty quick.
>
> **GALE is just slow my friend. I chatted with Michael last night** and they're still pending. I can't make them approve when I say, it's up to them unfortunately.'

Mr. Meyer writes under many aliases, some of whom purport to be hedge fund managers. For example, at Wall Street Cheat Sheet, his bio for "Christine Andrews" states that:

*Christine is an analyst and fund manager with almost 20 years of investment experience. She covers a variety of industries, with a special focus on technology, and likes to write about value stocks, poorly understood or under-followed situations, and contrarian perspectives.*

The fictitious Ms. Andrews also has had a bio and one article at TheStreet.com. *(Note: The article posted by the fictitious Ms. Andrews at TheStreet has since been removed from circulation.)*

Mr. Meyer also uses the Wall Street Cheat Sheet where he uses the aliases James Ratz (also a supposed LA hedge fund manager), Christine Andrews (shown above) and John Rivers. He also uses his real name there under Tom Meyer to write articles about CytRx. *(Note: Wall Street Cheat Sheet's contributor program was a beta program with just 12 contributors. The site has now removed all articles that it has linked to DreamTeam writers, including on CytRx and Galena.)*

Mr. Meyer also has accounts at the Motley Fool under "James Johnson" as well as "Ted Mayer". *(Note: All of his past articles under both of these aliases have since been removed from circulation by Motley Fool.)*

At Forbes he uses his real name, Tom Meyer, but the picture doesn't look anything like the individual I met in person in Chicago. In December, an article at Forbes sent CytRx soaring by nearly 50%, from the mid $4s to almost $7.00. *(Note: Meyer's articles at Forbes have since been removed from circulation.)*

Finally, on Seeking Alpha he has written under the four names of Wonderful Wizard, Equity Options Guru, Kingmaker and Expected Growth. *(Note: All*

*articles linked to Mr. Meyer or Mr. Mylant on CytRx and Galena, along with a number of others, have since been removed by Seeking Alpha.)*

In Appendix I, I have included the links to the 13 articles (on CytRx alone) that have been recently published by Meyer and Mylant, along with the stated name (ie. alias) of the author where applicable. These are the links as they appear in Yahoo Finance. Clicking on them simply reveals that they have been pulled from circulation. But it at least allows us to see when the articles were written along with the promotional titles and the (stated) name of the author.

For those who are interested in reading the actual articles which have been removed, I have spent the past 6 weeks archiving as many articles as possible on CytRx and other companies and I have made the originals for CytRx available at MoxReports.com. I plan on posting additional archived files going forward.

### *Promoting the promotion - one step further*

An additional feature of interest is that once these articles were published, DreamTeam / Mission IR would then tout the publication of these "independent" articles on its own website, further pretending that they had been written by independent sources.

For example, on its website Mission IR notes that:

> 'CytRx Corp.'s Aldoxorubicin Demonstrates Blockbuster Potential, Says Motley Fool Contributor'

It was actually an article written by Mr. Meyer under the alias of James Johnson.

A separate post on the Mission IR blog site quotes the "LA hedge fund manager" James Ratz for his article on Wall Street Cheat Sheet.

Once again, the real underlying author was the same Tom Meyer, who was being paid by DreamTeam / Mission IR but without providing disclosure.

Nearly every article written by a DreamTeam author gets quoted on the Mission blog posts as if they were written by independent authors.

### **CytRx management was heavily involved in editing the articles**

> 'Mr. Meyer sent one of my dummy articles to Galena management, but before they got a chance to send me their revisions, Adam Feuerstein from TheStreet.com wrote an exposé highlighting the DreamTeam and its paid promotion campaign with Galena. Right at that time (likely while Mr. Feuerstein was calling Galena), Mr. Meyer suddenly informed me that he would no longer need an article for Galena. The fact that management had enough control to prevent publication shows that they knew they were paying for these articles.

> Hang tight for a bit on those articles. We're going to let this GALE storm clear the air for a bit and so we're going to take a break from writing on all symbols for at least a little while. AF killed DreamTeam in the article and I think Galena may have fired DreamTeam (not sure on that yet). We're going to pay you for your Galena research though ($300) once I get your

- 16 -

W9. We will pay you for CYTR and [XXXXX] once we get back to biz and get them published.

This hasn't happened before and is really the fault of GALE management who basically dumped their shares at the high point. They're idiots and who knows what will happen to them later on. Sorry for the trouble, just need to let this sh\*tstorm pass.'

*(Note: Again, references to other tickers within these emails should not be interpreted to conclusively indicate that these companies had knowledge or involvement in these promotions.)*

**For CytRx, on the other hand, he was very eager to get an article published. And this happened to be in the few days leading up to their equity offering.**

CytRx management received my articles and then quickly provided feedback, emailed via Mr. Meyer. This was presumably done to maintain the appearance that management was not an active participant and that the process was being entirely orchestrated by DreamTeam.

Changes would be run through Michael McCarthy who runs DreamTeam. Mr. Meyer let me know that CytRx typically provides heavy changes in these paid articles and that I should not take it personally that their changes to my dummy article were so extensive. Mr. Meyer told me that it would be VP of Business Development David Haen who made most of the changes.

On January 29th, I said in an email:

'man oh man....those were extensive changes. he basically re-wrote about 25% of the article.'

To which Mr. Meyer replied:

'Every once in a while a company will be really picky. CYTR is one of them. Our other companies aren't nearly as bad.
Let me know when you submit.
Thx'

In fact, it was easy to confirm who made the actual edits by simply using the "Track Changes" feature in Microsoft Word. As can be seen in the pdf files below, the changes were made by David Haen, VP of Business Development and a minor change by Lauren Terrado, Executive Assistant to the CEO. Changes marked "xx" are changes between the two versions of the documents I submitted. One was before the equity offering was announced, one was after.
I include 4 links here which I **strongly encourage readers open and read**.

Readers should keep in mind that the original document was one that was provided to CytRx only by me via Mr. Meyer. This can be seen by looking at the term "CYTR_RP" (my initials) within the filenames at the top of page 2 on the track changes files.

- 17 -

#1 - Entire article with edits made by David Haen [4]
#2 - e signatures for individual edits by Haen [5]
#3 - Entire article with edits made by Lauren Terrado [6]
#4 - e signatures for individual edits made by Terrado [7]

*Note: The date listed on the cover page of the PDFs is February 12th, 2014. This is simply the date on which I printed these files as PDFs. As shown inside, Mr. Haen's edits were provided on January 29th. Ms. Terrado's were provided on February 3rd. On February 5th, CytRx announced the closing of the equity offering for a total of $86 million in proceeds.*

The conclusions should be obvious.

CytRx management was well aware that these articles are being published. They also knew that these have been articles via DreamTeam / Mission IR. They were also actively participating in the editing of the articles. Management also should have been well aware that no disclosure was being made about the fact the CytRx management was paying DreamTeam and the writers for these articles, or about the editing of them.

**During the time of the offering (in early February), Tom Meyer published two bullish articles on CytRx. To the extent that CytRx management provided edits and paid for this promotion, it raises the risk that investors in this deal and the investment bank involved will feel duped with respect to the exercise of the greenshoe during the offering. This potentially creates the risk that CytRx may not be able keep the proceeds raised in the offering due to potential legal consequences.**

**CytRx's connections with Galena**

Readers should keep in mind that Galena was originally a subsidiary of CytRx and was later spun out of the company. CytRx CEO Steven Kriegsman is also a director of Galena and recently took in nearly $3 million from selling Galena stock in January, before the recent plunge.

On February 12th, TheStreet.com published an article entitled "Galena Biopharma Pays For Stock-Touting Campaign While Insiders Cash Out Millions". The crux of the piece was that two articles on Galena had recently been removed from Seeking Alpha because they were both posted by one individual using the multiple aliases of Kingmaker and Wonderful Wizard. TheStreet noted that:

---

[4]     Available:http://moxreports.com/wp-content/uploads/x12-David-Haen-CYTR-entire-document.pdf

[5]     Available:  http://moxreports.com/wp-content/uploads/x13-David-Haen-signed-revisions-CYTR.pdf

[6]     Available:  http://moxreports.com/wp-content/uploads/x14-Lauren-Terrado-CYTR-entire-document.pdf

[7]     Available:http://moxreports.com/wp-content/uploads/x15-Lauren-Terrado-signed-revisions-CYTR.pdf

'The articles were part of a broader, coordinated "brand awareness campaign" designed to boost Galena's stock price, according to a document obtained by TheStreet'

TheStreet identified the DreamTeam Group as being behind the promotion, pointing to a $50,000 payment which had (at one time) been disclosed on DTG's website. The disclosure of this payment has since been removed from DTG's website.

Since that time, a series of lawsuits against Galena have been announced and the stock is now down by around 40% from where it was before the Feuerstein article. Prior to the Feuerstein article, Galena had been trading as high as $5.46 and it is now trading at around $3.20. Also like CytRx, Galena had hit a high of around $8.00 in January.

**As the lawsuits against Galena have multiplied, the share price has steadily weakened. Some of this weakness has crossed over into shares of CytRx, as a result of the close links between these companies.**

At CytRx alone, Mr. Kriegsman has paid himself over $5 million over the past 3 years ($2.8 million in 2013 alone). Most recently, last week he increased his base salary from $700,000 to $850,000 and (oddly) paid himself a spot "retention bonus" of $300,000. So even before his bonus in 2014 he will have already made well over $1 million in up front pay. This is certainly eye popping for a pre-revenue biotech.

Following the heavy media attention on Galena, the DreamTeam has removed from its website disclosure on both CytRx and Galena. But the cached pages from search engines still show that the amount paid by CytRx to DreamTeam was $65,000. The fact that DreamTeam is now removing its own disclosures on CytRx and Galena is telling in and of itself. It is cause for substantial concern.

And as of now, a growing number of articles covering Galena and now CytRx have been removed from the media sites listed above. I expect that the legal fallout from this undisclosed promotion campaign is just beginning.

**Looking at the securities laws**

For those who are not familiar with US Federal Securities Law, I have included reference to Section 17b, which deals with paid touting of stocks and the required legal disclosure. I have also included reference to Section 10b(5), also known as the "anti-fraud provision". To the extent that management was paying for and editing these articles by supposedly independent authors, it raises the possibility that these articles can now be considered to be statements issued by management themselves. This creates the potential that management could therefore be on the hook for any exaggerated or inaccurate statements made by these small time paid writers who were aggressively looking to boost the share prices.

*Note: I am not a lawyer nor am I a securities regulator. But I am an individual with a strong background in the securities industry and I have spoken about these issues with several securities law attorneys. Based on this information I have reached a number of my own conclusions in terms of the legal implications of these activities. Readers should come to their own conclusions. Readers who wish*

- 19 -

*to obtain formal legal advice or opinions should consult with an attorney of their own who specializes in securities law.*

Those who are interested in background information on these types of situations can refer to this article which details an SEC crackdown on internet stock touting and the laws that were violated. It is a forceful read and I strongly encourage readers to at least give it a quick browse.

The article quotes the SEC Director of Enforcement describing actions against **44 individuals and companies** as saying:

> 'In all of these cases, the Internet promoters gave ostensibly independent opinions about Microcap companies that in reality were bought and paid for.'

The article includes the following definition of Section 17b.

> 'It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, **directly or indirectly, from an issuer, underwriter, or dealer**, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." (15 U.S.C. § 77q(B).)'

*The key point to note is that this Section applies to both direct and indirect payments which come from an issuer, underwriter or dealer in connection with the promotion of their stock.*

As per their (now removed) disclosure, DreamTeam was receiving payments from CytRx and Galena (the issuers). The writers indirectly received this via DreamTeam. From the documents above it seems clear that the issuer was then well involved in the process via the **editing and oversight**.

But this also raises another, much thornier issue. Public companies must generally be very careful about what they say about themselves in order to avoid violating the anti-fraud provisions of the securities code. This is section10b(5) which states that:

> **'Rule 10b-5: Employment of Manipulative and Deceptive Practices**
>
> It shall be unlawful for any person, **directly or indirectly**, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (A) To employ any **device, scheme, or artifice to defraud**,
> (B) To **make any untrue statement** of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(C) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person **in connection with the purchase or sale of any security**.'

Wikipedia is often a source that should be approached with some caution. However, its content on 10b(5) is useful.

**Here is the problem:**

Because CytRx was paying for articles to be written, and because CytRx was signing off on (and editing) them, it raises the prospect that all of the statements within these articles will be viewed (for legal purposes) as having been issued by CytRx itself. After all, they did pay to have these statements made to the public and they did oversee the editing of the articles.

**That means that any mistake or exaggeration by any of these small time authors could potentially constitute fraud by CytRx management to the extent that the statements were speculative, promotional or incorrect.**

The fact that these promotions then culminated in the sale of securities by CytRx in the recent capital raise (i.e. an offering of securities) only serves to heighten these concerns.

To me the issues seem quite obvious. But again, I emphasize that I am not a securities attorney or a regulator, so I encourage readers to evaluate the facts and the laws and arrive at their own understanding in order to best handicap the odds and magnitude of any fallout from the items presented above. To the extent that there arise class action lawsuits against CytRx, those suits will likely do a more thorough job of spelling out the specific legal issues.

**But what about the cash?**

In February, CytRx closed its offering of $86 million (inclusive of greenshoe) worth of new shares at a price of $6.50. This may appear to give CytRx a decent cushion of safety vs. its market cap of around $250 million at present.

But to the extent that it is determined that the offering was conducted on the back of an undisclosed paid promotion, it could create significant legal uncertainty about the company's ability to keep this newly raised money. If the share price drops sharply, investors in this deal could potentially file claim that they were defrauded into buying shares of CytRx near a 4 year high. In fact, the share price has already dropped to well below the $6.50 offering price and even further below the recent high share price of $8.35.

**As a result, I view this "cushion" of around $2.00 per share to be at risk, creating the potential for the stock to trade well below any perceived "cash floor" of $2.00.**

*Looking at the share price of CytRx*

CytRx is a pre-revenue biotech with multiple compounds in the hopper. It is expected that results from Phase 3 clinical trials will become known in 3-4 years (2017-2018). But the problem is that if the company had such stellar prospects, then why would it choose to conduct a highly inappropriate paid promotion campaign just so that it could raise $86 million in a stock sale?

I take the view that the blatant paid stock promotion itself casts doubt on every other statement the management has made, including those regarding the prospects for any of its drug candidates. But readers should make their own decision as to whether or not the non-disclosure of payments and editing of promotional articles is reason to doubt other promotional statements.

The most urgent concern is the fallout which can be expected from the SEC and the NASDAQ in connection with this promotional campaign.

Following the release of Phase 2 data in December, CytRx's share price jumped from as low as $2.19 to as high as $6.79. But the initial move in the stock was only around 80%. Yet (as shown below) this was accompanied by 3 positive articles in a row by Mr. Meyer and Mr. Mylant and the stock continued to soar post-announcement, **tripling** in 3 days.

However, by December 26th, the share price had fallen back to $4.62.

On December 27th, Tom Meyer published an article in **Forbes** entitled "The Race To Develop A Brain Cancer Treatment Takes An Interesting Turn". He then quickly published another article on Seeking Alpha (under the alias Equity Options Guru) entitled "CytRx Corporation Poised For Success In 2014". Within days the stock had risen to a new 52 week high at $6.90, another **increase of nearly 50%.** (*Note: Both of those articles have since been removed from circulation.*)

**The point is that these various articles demonstrably had an enormous effect on the share price.**

The following graph shows the CytRx share price since November along with orange dots to show when the 13 articles were published by Meyer or Mylant.



### Looking at the fundamentals at CytRx

So far I have deliberately refrained from providing any analysis of the fundamentals at CytRx, including the prospects for their compounds in FDA trials. Based on the facts presented above, it is the stock market promotion that has dominated the share price action, bringing the stock to multi-year highs.

CytRx is held just 26% by institutions, implying a high ownership by retail investors. The promotions (via at least 13 paid articles) were well underway prior to the release of Phase 2 data in December, such that the release of that data likely had a greatly exaggerated effect on the share price.

Readers should keep in mind that drugs do not "pass" Phase 2 trials. It is the decision of the sponsor (ie. CytRx) whether or not to proceed to Phase 3. The FDA would certainly halt a study if it was deemed to be dangerous to the patients enrolled. But the FDA would not otherwise rule on effectiveness or stop a trial at Phase 2.

Aldox was recently given Special Protocol Assessment. However, this is simply the FDA's way of saying that the study design is rigorous enough that the trial will not be rejected based on study design alone. It is categorically not an expression of confidence in any expected results themselves and it is not an expression of confidence in the drug itself.

The point I am trying to make is that these findings should not be viewed either as strong positives or strong negatives for CytRx. Yet a review of the various paid promotional articles shows that they have portrayed the "passing" of Phase 2 and the SPA designation as being very strong positives which supposedly make ultimate success much more likely. This is wrong.

### Adam Feuerstein speaks and Tom Meyer rebuts

On December 16th, it was once again Adam Feuerstein who wrote an article entitled "CytRx Directors Are $3M Richer With Well-Timed Stock Option Grants". He made two main points.

First, CytRx directors had approved option grants for themselves almost immediately before the release of the Phase 2 data which sent the stock price soaring. As a result, they netted millions of dollars in gains within days.

Second, the actual underlying data beneath this Phase 2 trial was far less compelling than it appeared on the surface. For some reason patients in this trial had a 0% response rate for tumor shrinkage with the legacy drug doxorubicin. This is unusual in that dox is considered the standard treatment for sarcoma patients. A 0% response in this control arm provided a very strong (apparent) boost for CytRx's aldox.

Feuerstein also notes that more than 60% of the patients enrolled in CytRx's aldox study were in India, Romania, Russia and Ukraine, implying that accuracy may not be as high as for a study which had been done primarily in the US and/or Western Europe.

Mr. Meyer responded in a rebuttal article on Wall Street Cheat Sheet (using his own name, but not disclosing payment or editing from CytRx) in an article entitled "Inaccurate Article Sends CytRx Shares Lower".

Mr. Meyer noted that:

> 'Unfortunately, an inaccurate report was published on Monday, December 16, by The Street's Adam Feuerstein. The report contained several inaccuracies, which caused shares of CytRx to sell off by more than 10 percent.

Mr. Meyer makes the point that the board had previously met in December 2012 with no spikes in the share price at that time. He also notes that 30% of the trial participants were from the US. Mr. Feuerstein apparently included participants from Hungary into his Eastern Europe calculations. This should only total 58% from those countries, not 60%. Mr. Meyer also includes a very detailed analysis of the underlying statistics which would appear to have required a PhD in biology and clinical statistics for anyone to have written. (Note: the rebuttal article by Mr. Meyer has been removed from circulation but I have stored a saved PDF copy of it here.)

As always, Mission IR then posted on its website a highlight of these corrections to the described inaccurate Feuerstein article, quoting Mr. Meyer, but not disclosing that he was being paid or if the content within was coming from CytRx management. **So Mission basically quoted someone who was quoting someone who was paying them to quote them.**

Again, I take the view that the fallout from the promotion will dominate the equation in determining the share price of CytRx. This is because Phase 3 trials are unlikely to be completed before 2017-2018 and the current cash balance following the $86 million equity offering may be in jeopardy due to the paid and edited stock promotion.

As a result of these factors, it is difficult to determine just how low the stock will trade. But due to the risk on the cash, there is the possibility that the stock trades back below $2.00.

Asked about the timing of articles coming out in conjunction with a **stock offering by CytRx**, Mr. Meyer had this to say:

> 'I had a long conversation with Michael about it. I don't like the fact that the company wanted your article out before the offering. I explained him to that it would make the writers look bad and he agreed. He had a conversation with the company about it.'

When asked about this, Michael McCarthy (head of DreamTeam) declined to comment.

### *Appendix I -articles on CytRx from Meyer and Mylant*

The following is a list of 13 recent articles (as shown on Yahoo Finance) touting CytRx. All of these were written by either Meyer or Mylant while they were getting paid by DreamTeam. These are the original links, however many of the articles have now been removed from circulation.

Aldoxorubicin: The Drug CytRx Investors Should Be Watching at Motley Fool (Mon Feb 10) [8]

James Johnson (Tom Meyer)

3 Newsworthy Biotech Stocks: BioDelivery, CytRx, TG Therapeutics at Wall St. Cheat Sheet (Mon, Feb 3)

James Ratz (Tom Meyer)

CytRx Is Heading to a Pivotal Trial at Wall St. Cheat Sheet (Tue, Feb 4)

John Rivers (Tom Meyer)

CytRx Corp. Is a High-Flying Stock at Wall St. Cheat Sheet (Wed, Jan 22)

James Ratz (Tom Meyer)

CytRx Corporation Poised For Success In 2014 at Seeking Alpha (Tue, Dec 31)

Equity Options Guru (Tom Meyer)

The Race To Develop A Brain Cancer Treatment Takes An Interesting Turn at Forbes (Fri, Dec 27)

Tom Meyer

Inaccurate Article Sends CytRx Shares Lower at Wall St. Cheat Sheet (Wed, Dec 18)

Tom Meyer

Is CytRx Corporation the Next Pharmacyclics? at Wall St. Cheat Sheet (Fri, Dec 13)

James Ratz (Tom Meyer)

CytRx Surges As Aldoxorubicin Dominates Doxorubicin In Phase IIB Tests at Seeking Alpha (Thu, Dec 12)

John Mylant

CytRx Corporation Soars on Positive Phase 2b Sarcoma Data at Wall St. Cheat Sheet (Wed, Dec 11)

Tom Meyer

CytRx Corporation Offers Hope for Brain Cancer Patients at Wall St. Cheat Sheet (Thu, Dec 5)

---

[8]     Links for each of these articles found in Appendix I are located in the text of the original article, although as the author notes, some had been removed from the websites.   Available: http://seekingalpha.com/article/2086173-behind-the-scenes-with-dream-team-cytrx-and-galena

Tom Meyer

Aldoxorubicin Continues To Prove Itself As A Viable Cancer Treatment at Seeking Alpha (Tue, Nov 19)

John Mylant

CytRx Surges Ahead With Positive Drug Data at Seeking Alpha (Fri, Nov 1)

Equity Options Guru (Tom Meyer)

**Appendix II - responses from McCarthy, CytRx, and Galena**

I did speak with Michael McCarthy by phone and asked about his relationship with Mr. Meyer, Galena and Cytrx. I also asked about the payments to authors and the editing by Galena and CytRx. His only response to a series of questions was "I am unable to comment on that at this time." He repeated that answer verbatim to each question asked.

I also spoke to David Haen who provided the edits to the dummy article I sent. He initially stated that CytRx had stopped using the DreamTeam several months ago, "when the stock was a $2.00 stock". (Note: that would be back in November, which is when the campaign appears to have begun, not when it ended). When I pressed further he stated that it might have been "earlier this year". As I discussed the editing of documents with him, he noted that CytRx may have provided "some new or original content" to writers but that he felt most of it was for editing for accuracy. Readers can refer to my attached edited dummy article and to the comments which came from Tom Meyer's emails to make their own determination about the extensiveness of Mr. Haen's changes. I did inform Mr. Haen that I would be writing an article on this topic and gave him the opportunity to provide comment.

I did receive a call back from Galena management. However, they notified me that due to the ongoing class action lawsuits they would not be able to provide any responses to anything in connection with the DreamTeam promotion.

(Emphasis in original).

33.     The information in Pearson's article provides a detailed account of DreamTeam's services and the relationship between DreamTeam and CytRx (under the Individual Defendants' direction and on their watch).  As described in the Pearson article above, Mr. Meyer and Mr. Mylant published approximately 13 articles on CytRx between November 2013 and March 2014. These articles had a "very dramatic impact on the share price" of CytRx common stock.  This is made particularly clear by the fact that in the initial work proposal, it was clearly spelled out that management of the companies would have to *sign off (and edit)* the articles AND the writer would *not be allowed to disclose* that he was getting paid.  Together, those two prerequisites are

highly unethical and illicit.  Added to these facts the comments inserted into the articles by defendant Kriegsman's secretary, the scheme becomes even more duplicitous.  Critically, the Board failed to disclose this stock pumping scheme to the public.  There is no mention in any of CytRx's SEC filings prior to Pearson expose that it had engaged DreamTeam or any other company to provide this type of services to the Company.

34.     This course of action is remarkably similar to the textbook definition of a pump and dump scheme.  This has been described as a "scheme that attempts to boost the price of a stock through recommendations based on false, misleading or greatly exaggerated statements. The perpetrators of this scheme, who already have an established position in the company's stock, sell their positions after the hype has led to a higher share price."[9]  As Investopedia notes, "the victims of this scheme will often lose a considerable amount of their investment as the stock often falls back down after the process is complete."

35.     While the Individual Defendants did not sell their personal shares during the stock "pumping", they did cause the Company to conduct a public offering of stock.  On December 6, 2012, the Company filed its initial Registration Statement with the SEC, who declared the Registration Statement effective on December 21, 2012.   On January 31, 2014, the Company filed its Prospectus with the SEC and made it available to the investing public.  That same day, 11,500,000 shares of CytRx common stock were offered for sale at $6.50 per share.   In addition,

---

[9]     Available: [http://www.investopedia.com/terms/p/pumpanddump.asp]; Accessed March 26, 2014.

Investopedia explains "Pump and Dump"
Traditionally, this type of scheme was done through cold calling, but with the advent of the internet this illicit practice has become even more prevalent. Pump and dump schemes usually target micro- and small-cap stocks, as they are the easiest to manipulate. Due to the small float of these types of stocks it does not take a lot of new buyers to push a stock higher.

Claims about how a stock is set to break out should be met with a considerable amount of caution. It is important to always do your own research in a stock before making an investment.

the Underwriter Defendants exercised their combined option to purchase an additional, 725,000 shares of CytRx.  The $86 million offering was completed on February 5, 2014.

36.     During the period of the Individual Defendants' illicit scheme of undisclosed paid promotions via DreamTeam, the Company's stock price nearly quadrupled, from approximately $2.27 per share on November 1, 2013 to a high of $7.98 per share on January 30, 2014, the day before the Offering at $6.50 per share.  The Registration Statement and Prospectus (issued under the Individual Defendants' direction and on their watch) failed to disclose the existence of the scheme detailed herein (*i.e.* the relationship with DreamTeam), and/or did not disclose the extent to which the Company (under the Individual Defendants' direction and on their watch) had been involved in the editing and writing of these articles.  Instead, the Individual Defendants failed to disclose the use of DreamTeam to pay purportedly independent analysts to write laudatory articles to artificially inflate the price of CytRx common stock. Thus, the disclosures in the Registration Statement and Prospectus were deficient because they contained false statements and material omissions of fact since the Company failed to disclose the illicit scheme with DreamTeam.

37.     Further, on March 5, 2014, the Individual Defendants caused the Company to file with the SEC an annual report on Form 10-K (the "2013 10-K").  The 2013 10-K was signed by the Individual Defendants, and failed to disclose the Company's agreement and scheme with DreamTeam (as outlined above).

38.     In addition, the 2013 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), signed by defendants Kriegsman and Caloz, who stated:

> I, [Steven A. Kriegsman, Chief Executive Officer of CytRx Corporation/John Y. Caloz, Chief Financial Officer of CytRx Corporation], certify that:
>
> 1. I have reviewed this annual report on Form 10-K of CytRx Corporation;
>
> 2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the periods covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

Pursuant to 18 U.S.C. 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of CytRx Corporation (the "Company") hereby certifies that:

(i) the accompanying Annual Report on Form 10-K of the Company for the year ended December 31, 2013 (the "Report") fully complies with the requirements of

Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Insider Trading and Unjust Enrichment**

39.     Defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp (a majority of the Board) also breached their fiduciary duties with respect to their own director compensation. Concurrently with the above stock promotion scheme, defendants Link, Selter, Rubinfeld, and Wennekamp (a majority of the Board) served on the Board's Compensation Committee.  On December 9, 2013 these four defendants approved the grant of stock options to purchase 180,000 shares of common stock to each non-employee director (*i.e.*, themselves, plus defendant Ignarro).  The option grants, awarded to a majority of the Board, were to vest immediately while the strike price was set to the Company's closing stock price the next day, December 10, 2013.

40.     The next day, on December 11, 2013, the Individual Defendants caused the Company to issue a press release announcing "highly statistically significant positive results" from a phase IIb study of the cancer drug aldoxorubicin in soft tissue sarcoma.  ***CytRx shares close the day 57% higher.***  By the end of the trading week, CytRx's common stock was up 127%. This had the effect of boosting the value of each 180,000-option grant by $600,000.  Thus, the total take for CytRx's five non-employee directors: $3 million, directly out of Company coffers.

41.     These series of events present a variation on the classic case of spring-loading. Spring-loading occurs when directors deliberately time options grants to occur shortly before public announcements that the directors know will increase the stock price.  In this case, because CytRx regularly granted its Board members options on or around December 10th of each year, they knew of the results of the aldoxorubicin study and took advantage of their positions of authority to ensure it would be released following their stock option grants.  The press release was issued at 8 a.m. to coincide with the market opening.  Moreover, the release states that a conference call to discuss the results would occur at 10:30 a.m. that day.  The conference call and release could not reasonably have been organized and drafted the morning of December 11th, the date of the release.  The highly technical information contained in the release supports this

conclusion.  The only logical inference is that the Individual Defendants had knowledge of the results of the study days or weeks before the release was issued and held off releasing the information until they could receive the benefit of the corresponding stock price increase.  This was a breach of the duty of loyalty for all Individual Defendants.

42.     The press release revealed, in relevant part:

**CytRx Reports Highly Statistically Significant Positive Results from its Global Phase 2b Clinical Trial**

- Aldoxorubicin demonstrates 80-100% superiority over doxorubicin in progression-free survival as first-line therapy in advanced soft tissue sarcomas
- Median progression-free survival, 6-month progression-free survival and overall response rates all significantly favor aldoxorubicin treatment over doxorubicin
- All efficacy results for aldoxorubicin treatment are highly statistically significant compared with doxorubicin treatment

Conference call to be held today at 10:30 a.m. Eastern time

LOS ANGELES--(BUSINESS WIRE)--Dec. 11, 2013-- CytRx Corporation (NASDAQ: CYTR), a biopharmaceutical research and development company specializing in oncology, today announced highly positive top-line efficacy results from a multicenter, randomized, open-label global Phase 2b clinical trial. The trial investigated the efficacy and safety of aldoxorubicin compared with doxorubicin in subjects with first-line metastatic, locally advanced or unresectable soft tissue sarcomas (STS). Aldoxorubicin combines the chemotherapeutic agent doxorubicin with a novel linker-molecule that binds specifically to albumin in the blood to allow for delivery of higher amounts of doxorubicin (3½ to 4 times) without the major dose-limiting toxicities seen with administration of doxorubicin alone.

In this 123-subject, 31-center global Phase 2b clinical trial, subjects with advanced soft tissue sarcomas were administered either 350 mg/m2 of aldoxorubicin (83 subjects) or 75 mg/m2 of doxorubicin (40 subjects) every 3 weeks for up to 6 cycles. Subjects were followed every 6 weeks with CT scans to monitor tumor size. The primary endpoint was progression-free survival (PFS) as determined by both investigators at study sites and by a blinded radiology review performed at an independent central laboratory. Secondary endpoints included overall response rates (complete and partial) and PFS at 6 months for each group, and overall survival which will be reported when the clinical trial is complete.

Consistent with the trial protocol, CytRx used two approaches to evaluate the efficacy of aldoxorubicin compared to doxorubicin in patients with soft tissue sarcomas: assessment by the study investigators, as well as assessment by a blinded central laboratory review. In this study, both investigator assessment and central lab review showed an unambiguous 80-100% improvement in PFS among patients treated with aldoxorubicin. In an intent-to-treat analysis, the investigator-assessed median PFS was 8.4 months for aldoxorubicin patients versus 4.7 months for doxorubicin patients (p=0.0002), while the blinded central lab review

indicated that median PFS for aldoxorubicin patients was 5.7 months versus 2.8 months for doxorubicin patients (p=0.018). Per investigators, 67.1% of aldoxorubicin patients had not progressed at 6 months, compared with 36.1% of doxorubicin-treated patients (p=0.005). By blinded central lab review, 46.8% of aldoxorubicin patients had not progressed at 6 months, compared with 23.7% of doxorubicin patients (p=0.038).

The overall response rate as determined by the investigators was 25.4% for aldoxorubicin subjects (2.7% complete response and 22.7% partial response) versus 5.4% for doxorubicin subjects (0% complete response and 5.4% partial response). As assessed by blinded central lab review, 23.0% of aldoxorubicin subjects had a partial response while 0.0% of doxorubicin subjects exhibited any objective response.

As determined by both the trial investigators and by blinded central radiology review, subjects treated with aldoxorubicin demonstrated highly statistically significant better clinical outcomes than those receiving standard doxorubicin therapy for their soft tissue sarcomas.

"These results are extraordinary for a single agent treating these chemotherapy-resistant tumors," said study principal investigator Sant Chawla, M.D. of the Sarcoma Oncology Center in Santa Monica, California. "Aldoxorubicin is the first and only single agent to surpass doxorubicin as a first-line treatment for soft tissue sarcomas."

Dr. Chawla added, "Previous results from this trial presented at the Connective Tissue Oncology Meeting in October indicated that subjects treated with aldoxorubicin demonstrated no significant cardiotoxicity whereas doxorubicin shows cardiotoxicity at certain cumulative dose levels. No subjects left the study due to aldoxorubicin side effects. These findings together suggest that aldoxorubicin could become the treatment of choice for soft tissue sarcomas. Yet this drug's potential extends much further because doxorubicin in particular and anthracyclines in general are indicated as first- or second-line therapy for many other common cancers including breast, ovarian, small-cell lung, multiple myeloma, acute myelocytic leukemia and more. As such, the ability of aldoxorubicin to safely administer high doses of doxorubicin holds tremendous therapeutic potential to oncologists and their patients worldwide."

CytRx President and CEO Steven A. Kriegsman commented, "Aldoxorubicin is a major advance for treating soft tissue sarcomas. We extend gratitude to the investigators who so adeptly managed the conduct of this trial and to the patients and their families who participated in it. These data prove that by applying our proprietary linker technology to target the release of doxorubicin directly at the site of cancer we are able to safely increase the dosage of doxorubicin by approximately three and one-half to four times with tremendous clinical benefit to the patient."

In the Phase 2b clinical trial aldoxorubicin was found to be safe and well tolerated. All adverse events in subjects treated with aldoxorubicin were consistent with the known side effects of doxorubicin, resolved before the administration of the next dose and did not require treatment discontinuation. There were no treatment-related deaths in the aldoxorubicin group.

About the Phase 2b Trial Design

The study examined 123 subjects who received either aldoxorubicin or doxorubicin in a 2:1 randomization, respectively. Aldoxorubicin was administered to 83 subjects at a dosage of 350 mg/m2 (doxorubicin equivalents of 260 mg/m2) as a 30-minute intravenous infusion on Day 1 of each cycle, while doxorubicin (75 mg/m2) was administered to 40 subjects as a 5-30 minute infusion on Day 1 of each cycle. A cycle of therapy was defined as a 3-week (21-day) period. Multiple cycles were administered until the subject was withdrawn from therapy or until a maximum of 6 cycles were administered. CT scans were obtained every 6 weeks to assess tumor response and progression, and adverse events were collected in a case report form.

About Soft Tissue Sarcoma

STS is a cancer occurring in muscle, fat, blood vessels, tendons, fibrous tissues and connective tissue, and can arise anywhere in the body at any age. According to the American Cancer Society, there are approximately 50 types of STS; and in 2013 more than 11,400 new cases will be diagnosed in the U.S., and approximately 4,400 Americans will die from STS. In addition, approximately 40,000 new cases and 13,000 deaths in the U.S. and Europe are part of a growing underserved market.

About Aldoxorubicin

The widely used chemotherapeutic agent doxorubicin is delivered systemically and is highly toxic, which limits its dose to a level below its maximum therapeutic benefit. Doxorubicin also is associated with many side effects, especially the potential for damage to heart muscle at cumulative doses greater than 500 mg/m2. Aldoxorubicin combines doxorubicin with a novel single-molecule linker that binds directly and specifically to circulating albumin, the most plentiful protein in the bloodstream. Protein-hungry tumors concentrate albumin, thus increasing the delivery of the linker molecule with the attached doxorubicin to tumor sites. In the acidic environment of the tumor, but not the neutral environment of healthy tissues, doxorubicin is released. This allows for greater doses (3 ½ to 4 times) of doxorubicin to be administered while reducing its toxic side effects. In studies thus far there has been no evidence of clinically significant effects of aldoxorubicin on heart muscle, even at cumulative doses of drug well in excess of 2 g/m2.

43. Director compensation option grants appear to occur annually on or about December 9-10 of each year. The Individual Defendants knew about the close of the aldoxorubicin trial given its importance to the Company as its main product. The Individual Defendants had a duty not to take advantage of this information for their own personal, financial gain. This is especially true given that their gain came at the expense of CytRx's own finances. In essence, these Individual Defendants utilized their inside knowledge of material, non-public information to grant themselves approximately $3 million in undeserved compensation.

44. Accordingly, defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp (a majority of the Board) have been unjustly enriched through their breaches of fiduciary duties.

- 33 -

45.     As a result of the facts set forth above, and due to the actions of the Individual Defendants, the Company has been damaged.

### DERIVATIVE AND DEMAND ALLEGATIONS

46.     Plaintiff brings this action derivatively in the right and for the benefit of CytRx to redress the breaches of fiduciary duties and other violations of law by the Individual Defendants.

47.     Plaintiff will adequately and fairly represent the interests of CytRx and its shareholders in enforcing and prosecuting its rights.

48.     At the time this complaint was filed, the Board consisted of the following six (6) individuals:  defendants Kriegsman, Link, Rubinfeld, Selter, Wennekamp and Ignarro.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the following reasons:

**I.     Defendants Kriegsman and Rubinfeld Are Not Independent**

49.     Defendant Kriegsman is not independent.  Kriegsman serves as CytRx's President and CEO, pursuant to which he has received substantial monetary compensation and other valuable benefits.  In addition, the Company's own disclosures (including CytRx's 2013 Proxy Statement filed with the SEC on Form DEF 14A on May 1, 2014) admit that Kriegsman is not independent.  Thus, demand is excused as to Kriegsman

50.     Defendant Rubinfeld is not independent.  On December 2, 2008, the Individual Defendants caused the Company to enter into a written consulting agreement with defendant Rubinfeld, under which Rubinfeld agreed to serve as the Company's Chief Scientific Advisor.  In exchange, the Individual Defendants granted to Rubinfeld under the Company's 2008 Stock Incentive Plan a ten-year stock option to purchase up to 50,000 shares of CytRx common stock at an exercise price of $2.45 per share, which equaled the market price of CytRx common stock as of the grant date. The fair value of this option grant was $116,900.  The stock option vested immediately upon grant as to 7,143 of the option shares and vested as to the remaining option shares in 36 equal monthly installments, and is now fully vested.  Thereafter, on December 10, 2012, the Individual Defendants caused the Company to enter into an amendment to a written

consulting agreement with defendant Rubinfeld to provide for the one-time grant to defendant Rubinfeld under the Company's 2008 Plan of an option to purchase 30,000 shares of CytRx common stock at an exercise price of $1.83 per share, which was equal to the market price of CytRx common stock on the grant date.  The option has a term of ten years and is fully vested.  The fair grant date value of this option grant was $47,400.  Due to this intertwined financial relationship between Rubin and the Director Defendants and Rubinfeld's position as the Company's Chief Scientific Officer, Rubinfeld lacks independence.

51.   Accordingly, demand is excused as to Kriegsman and Rubinfeld.

## II. Defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp Are Not Disinterested Because They Received an Impermissible Financial Benefit The Day Before Major News Was Publicly Released

52.   As a result of the actions complained of herein, Link, Selter, Rubinfeld, Ignarro and Wennekamp (a majority of the Board) each received a material financial benefit that was not shared by CytRx's shareholders in that they were able to reap significant profits through the misuse of non-public Company information to which they were privy as a result of their positions as fiduciaries of the Company.

53.   Defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp received large quantities of stock options (180,000) *one day* before positive news was released by the Company regarding its main cancer drug.  Once this material information was received by the market, CytRx's common stock price rose 57% the following day, and 127% by the end of the week.  The illicit paper profits reaped by defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp were a direct result of their positions as fiduciaries of the Company and their knowledge of the forthcoming release which they ensured became public the day *after* their option grants were priced.  They were able to reap more than $3 million in additional compensation – paid for by CytRx – as a result of their actions.

54.   Due to the fact that defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp (who constitute a majority of the Board) each received significant pecuniary benefits from their wrongdoing, they are incapable of independently and disinterestedly considering a demand to

commence and vigorously prosecute this action without being influenced by their overriding personal interest.

55.    Accordingly, demand is futile and excused as to Link, Selter, Rubinfeld, Ignarro and Wennekamp (who constitute a majority of the Board).

**III.    Demand Is Futile for Each Board Member for Approving the DreamTeam**

56.    Defendants Kriegsman, Link, Selter, Rubinfeld, Ignarro and Wennekamp (*i.e.* the entire Board) served on CytRx's Board when they approved the contract with DreamTeam to provide unethical and/or illicit marketing efforts on behalf of CytRx.  This illicit activity is not entitled to the protections of the business judgment rule.  Further, these actions create a substantial likelihood of personal liability for each director who approved the DreamTeam and thus each director cannot independently consider a demand to commence and vigorously prosecute this action without being influenced by their overriding personal interest.

57.    There is a strong inference of Board-level knowledge regarding the DreamTeam's activity on behalf of CytRx.  The Pearson article describes the close relationship between CytRx and Galena.  Defendant Kriegsman, who is a Board member of Galena is the President, CEO and a director of CytRx and has been since July 2002.

58.    Defendants Kriegsman, Link, Selter, Rubinfeld, Ignarro and Wennekamp each face a substantial likelihood of liability for approving the DreamTeam scheme.  Accordingly, demand is futile and excused as to defendants Kriegsman, Link, Selter, Rubinfeld, Ignarro and Wennekamp (*i.e.* the entire Board).

**IV.    The Director Defendants Face a Substantial Likelihood of Liability for Causing CytRx to Disseminate False and Misleading Information**

59.    The Director Defendants (*i.e.* the entire Board) were responsible for reviewing and approving the Company's financial statements.  By authorizing the false financial statements and public statements set forth above, including the Registration Statement and Prospectus, the Director Defendants were active participants in breaches of candor and duty.  Among other things, the Director Defendants signed the false and misleading 2013 10-K.

60.     A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon the Director Defendants to bring suit against themselves would be a useless and futile act.

61.     The Director Defendants' knowing or reckless breaches of fiduciary duty constitute bad faith under Delaware law.  Bad-faith conduct is not protected under the business judgment rule.  Thus, the Director Defendants face a substantial likelihood of liability.  Demand is thus futile and excused.

**V.     Defendants Link, Selter, Rubinfeld and Wennekamp Face a Substantial Likelihood of Personal Liability and Are Not Disinterested Because They Approved an Impermissible Financial Benefit to Themselves When They Granted Themselves Options The Day Before Major News Was Publicly Released**

62.     As a result of the actions complained of herein, Link, Selter, Rubinfeld and Wennekamp (a majority of the Board), as members of the Board's Compensation Committee, granted themselves (and defendant Ignarro) a large quantity of stock options (180,000) ***one day*** before positive news was released by the Company regarding its main cancer drug.  Once this material information was received by the market, CytRx's common stock price rose 57% the following day and 127% for the week.  The illicit paper profits reaped by Link, Selter, Rubinfeld, Ignarro and Wennekamp were a direct result of their positions as fiduciaries of the Company, their knowledge of the forthcoming release which they ensured became public the day ***after*** their option grants were priced and their positions of authority on the Compensation Committee.

63.     Because Link, Selter, Rubinfeld and Wennekamp each voted to grant themselves significant pecuniary benefits from their wrongdoing, they each face a substantial likelihood of liability and are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action without being influenced by their overriding personal interest.

64.     Accordingly, demand is futile and excused as to Link, Selter, Rubinfeld and Wennekamp (a majority of the Board).

**VI.    Defendants Link, Selter, and Wennekamp Face a Substantial Likelihood of Liability as Members of the Audit Committee**

65.    The Audit Committee Defendants (a majority of the Board) face a substantial likelihood of liability.  The Audit Committee, *inter alia,* allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.   Further, the Audit Committee Defendants caused or allowed the above referenced breaches of the Company's Code of Conduct.   Therefore, defendants Link, Selter and Wennekamp (a majority of the Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**COUNT I**
**Breach of Fiduciary Duties**
**for Disseminating False and Misleading Information**
**(Against All Defendants)**

66.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.    As alleged in detail herein, each of the Defendants had a duty to ensure that CytRx disseminated accurate, truthful and complete information to its shareholders.

68.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to CytRx shareholders materially misleading and inaccurate information through, inter alia, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

69.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

**COUNT II**
**Breach of Fiduciary Duties**
**for Failing to Maintain Internal Controls**
**(Against All Defendants)**

70.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

72.     Defendants willfully ignored the obvious and pervasive problems with CytRx's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

73.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

### COUNT III
### Unjust Enrichment
### (Against All Defendants)

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of CytRx.

76.     Plaintiff, as a shareholder and representative of CytRx, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

### COUNT IV
### Gross Mismanagement
### (Against All Defendants)

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     Defendants had a duty to CytRx and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of CytRx.

79.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of CytRx in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of CytRx's affairs and in the use and preservation of CytRx's assets.

80.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused CytRx to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to CytRx, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged CytRx.

**COUNT V**
**Abuse of Control**
**(Against All Defendants)**

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CytRx, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing CytRx to misrepresent material facts regarding its financial position.

83.     As a direct and proximate result of Defendants' abuse of control, CytRx has sustained significant damages.

84.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

85.     Plaintiff, on behalf of CytRx, has no adequate remedy at law.

**COUNT VI**
**Unjust Enrichment**
**(Against Defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp)**

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 40 -

87.     By their wrongful acts, defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp were unjustly enriched at the expense of and to the detriment of CytRx and it would be unconscionable to allow them to retain the benefits of their illicit conduct.  These defendants were unjustly enriched by their receipt of market-timed stock options of CytRx common stock, as alleged herein.

88.     Plaintiff, as a shareholder of CytRx, seeks restitution from these defendants, and each of them, and seeks an order of this Court repricing all stock options granted on December 10, 2013 to the close price on December 11, 2013.

89.     As a result of defendants Link, Selter, Rubinfeld, Ignarro and Wennekamp's unjust enrichment, CytRx has been injured and is entitled to damages.

## COUNT VII
### Insider Selling and Misappropriation of Information
### (Against Defendants Link, Selter, Rubinfeld and Wennekamp)

90.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.     By their wrongful acts, defendants Link, Selter, Rubinfeld and Wennekamp granted themselves spring-loaded stock options at the expense of and to the detriment of CytRx and it would be unconscionable to allow them to retain the benefits of their illicit conduct.  These defendants were unjustly enriched by their receipt of spring-loaded stock options of CytRx common stock, as alleged herein.

92.     Plaintiff, as a shareholder of CytRx, seeks restitution from these defendants, and each of them, and seeks an order of this Court repricing all stock options granted on December 10, 2013 to the close price on December 11, 2013.

93.     As a result of defendants Link, Selter, Rubinfeld and Wennekamp's insider trading, CytRx has been injured and is entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

1        B.     Directing CytRx to take all necessary actions to reform and improve its corporate

2  governance and internal procedures to comply with applicable laws and to protect the Company

3  and its shareholders from a repeat of the damaging events described herein, including, but not

4  limited to, putting forward for shareholder vote resolutions for amendments to CytRx's By-Laws

5  or Articles of Incorporation and taking such other action as may be necessary to place before

6  shareholders for a vote a proposal to strengthen the Board's supervision of operations and

7  develop and implement procedures for greater shareholder input into the policies and guidelines

8  of the Board;

9        C.     Awarding to CytRx restitution from Defendants, and each of them, and ordering

10  disgorgement of all profits, benefits and other compensation obtained by the Individual

11  Defendants;

12        D.     Awarding to Plaintiff the costs and disbursements of the action, including

13  reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

14        E.     Granting such other and further relief as the Court deems just and proper.

15                           **DEMAND FOR JURY TRIAL**

16       Plaintiff demands a trial by jury on all issues so triable.

17  DATED:  August 15, 2014            THE WEISER LAW FIRM, P.C.

18

19                                /s/ KATHLEEN A. HERKENHOFF

20                         KATHLEEN A. HERKENHOFF (168562)

                        12707 High Bluff Drive, Suite 200

21                       San Diego, CA 92130

                        Telephone: 858-794-1441

22                       Facsimile: 858-794-1450

                        kah@weiserlawfirm.com

23                       THE WEISER LAW FIRM, P.C.

                        ROBERT B. WEISER

24                       BRETT D. STECKER

                        JEFFREY J. CIARLANTO

25                       22 Cassatt Avenue, First Floor

                        Berwyn, PA 19312

26                       Telephone: (610) 225-2677

                        Facsimile:  (610) 408-8062

27

28

                                 - 42 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE SHUMAN LAW FIRM
Kip B. Shuman
kip@shumanlawfirm.com
Rusty E. Glenn
885 Arapahoe Avenue
Boulder, Colorado  80302
Telephone:  (303) 861-3003
Facsimile:  (303) 484-4886
rusty@shumanlawfirm.com

Counsel for Plaintiff

THE ROSSBACHER FIRM
Henry H. Rossbacher
1004 Woodstock Lane
Ventura, CA 93001
Telephone: (213) 219-1119
h.rossbacher@rossbacherlaw.com

Local Counsel for Plaintiff

## CytRx Corporation Verification

I, Jack Taylor, hereby verify that I am familiar with the allegations in the Verified

Shareholder Derivative Complaint and that I have authorized the filing of the Verified

Shareholder Derivative Complaint, and that the foregoing is true and correct to the best of my

knowledge, information and belief.

Date: 07 - 30 - 2014

Jack Taylor